UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| BRIAN AUTHEMENT, JR.,<br>Plaintiff | CIVIL ACTION NO. 1:16-CV-00151 |
| VERSUS | JUDGE DRELL |
| MEAGAN WILKINSON, *ET AL.*,<br>Defendants | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

Before the Court is a Motion for Summary Judgment (Doc. 98) filed by Defendants Meagan Wilkinson ("Wilkinson"), Malcolm Smalls ("Smalls"), and Steven McNeely ("McNeely") ("Defendants"). Plaintiff Brian Authement, Jr. ("Authement") opposes the motion. (Doc. 109). Because there is no genuine issue of material fact whether Defendants were deliberately indifferent to Authement's serious medical needs, Defendants' Motion for Summary Judgment (Doc. 98) should be GRANTED as to Authement's § 1983 claims and Authement's supplemental state law negligence claim.

## I.    Background

Authement, proceeding *in forma pauperis*, filed a civil rights complaint under 42 U.S.C. § 1983 on February 1, 2016. (Doc. 1). Authement also alleges a supplemental state law negligence claim. (Doc. 1). Authement names Smalls, Meagan Hernandez, and "Lieutenant Unknown" in their individual and official capacities. (Doc. 1). Authement substituted Wilkinson for Meagan Hernandez (Doc.

41).  Authement also filed a First-Amended Complaint and substituted McNeely for "Lieutenant Unknown." (Doc. 53).

Authement is an inmate in the custody of Department of Public Safety and Corrections ("DOC").  (Doc. 1).  Authement was incarcerated at River Correctional Center ("RCC") at the time of the alleged conduct.  (Doc. 1).  Authement claims Defendants were deliberately indifferent to his serious medical needs under 42 U.S.C. § 1983.  (Doc. 1).  Authement claims Defendants denied him medical treatment, access to a medical doctor, and treatment prescribed by a medical doctor. (Doc. 1).  Authement seeks monetary and punitive damages, costs, and attorney fees.  (Doc. 1).

Defendants each filed Motions to Dismiss for Failure to State a Claim, which were denied.  (Docs. 82, 118).  Defendants answered the Complaint and Amended Complaint asserting various affirmative defenses, including prescription and qualified immunity.  (Docs. 83, 84, 85).

Defendants now move for summary judgment, seeking dismissal of Authement's remaining claims against them.  (Docs. 98, 101).  Defendants claim that Authement's testimony, together with medical records and uncontradicted testimony of defendants, shows no named Defendant has any responsibility under federal or state law for the claimed failures.  (Doc. 101).  Defendants maintain all claims were prescribed at the time of filing suit.[1]  (Doc. 101).  Authement opposes

---

[1] Defendants argue Authement's claims were filed more than a year after his claims accrued.  (Doc. 101).  Defendants previously filed Motions to Dismiss (Docs. 25, 44, 70) on the same grounds.  (Docs. 55, 82).  This Court denied Wilkinson's and Smalls's motions, finding that the prescriptive period was suspended when Authement filed an ARP with RCC.  (Docs. 82).  Additionally, the Court denied

the motion with exhibits, including medical records, deposition testimony, and declarations. (Doc. 109).

## II.    Law and Analysis

### A.    Standards governing the Motion for Summary Judgment.

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Paragraph (e) of Rule 56 also provides the following:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or
> (4) issue any other appropriate order.[2]

Substantive law determines what facts are "material." A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. Stewart v.

---

McNeely's motion, finding that Authement's allegations treat Defendants as joint tortfeasors; thus, the timely filing of Authement's original complaint against Wilkinson and Smalls interrupts prescription of Authement's claims against McNeely. (Doc. 118).

[2] Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

Murphy, 174 F.3d 530, 533 (5th Cir.), cert. denied, 528 U.S. 906 (1999) (internal citations omitted). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Hefren v. McDermott, Inc., 820 F.3d 767, 771 (5th Cir. 2016) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

In deciding a motion for summary judgment, a court must construe all facts and draw all inferences in the light most favorable to the nonmovant. Dillon v. Rogers, 596 F.3d 260, 266 (5th Cir. 2010). If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then offer evidence sufficient to establish a genuine issue of material fact. Herrera v. Millsap, 862 F.2d 1157, 115 (5th Cir. 1989). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient to defeat a motion for summary judgment. Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. denied, 506 U.S. 825 (1992).

Additionally, where a defendant asserts qualified immunity at the summary judgment stage, "the burden shifts to the Plaintiff to raise facts that dispute the defendant's assertion of qualified immunity." Estate of Pollard v. Hood Cnty., Tex, 579 F.App'x 260, 264 (5th Cir. 2014) (per curiam). The court must still view all facts and make all reasonable inferences in light most favorable to the plaintiff. Id. But "plaintiff must produce evidence that presents a genuine issue of material fact that (1) the defendants' conduct amounts to a violation of the plaintiff's constitutional right; and (2) the defendants' actions were 'objectively unreasonable

in light of clearly established law at the time of the conduct in question." Id. (quoting Cantrell v. City of Murphy, 666 F.3d 911, 922 (5th Cir. 2012). cert. denied, 133 S.Ct. 119 (2012). If the plaintiff fails, the motion for summary judgment should be granted. Estate of Pollard, 579 F.App'x at 264.

B.    Qualified Immunity

Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability, so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. Gobert v. Caldwell, 463 F.3d 339, 345 (5th Cir. 2006) (citing Anderson v. Creighton, 483 U.S. 635, 638 (1987)). In determining whether an official enjoys qualified immunity, the Court must determine (1) whether the plaintiff has demonstrated a violation of a clearly established federal constitutional or statutory right, and (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known. Id. (citing Hope v. Pelzer, 536 U.S. 730 (2002)).

C.    Deliberate Indifference

The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they act with "deliberate indifference" to the serious medical needs of prisoners.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994); Estelle v. Gamble, 429 U.S. 97, 105 (1976).  Deliberate indifference "is an extremely high standard to meet."  Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006) (citation omitted).

In order to state a cognizable claim under § 1983 because of inadequate medical care, a prisoner must allege acts or omissions "sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97 (1976).  First, the deprivation must be, objectively, sufficiently serious and the prison official's act or omission must result in the denial of the minimum civilized measure of life's necessities.  Second, a prison official must have a sufficiently culpable state of mind – deliberate indifference to a prisoner's constitutional rights – to be subject to § 1983 liability.  See Farmer, 511 U.S. at 834. The Supreme Court defined "deliberate indifference" as "subjective recklessness," or, in other words, a conscious disregard of a substantial risk of serious harm.  Id.

Because an inadvertent failure to provide adequate medical treatment does not violate the Eight Amendment, deliberate indifference does not include a complaint that a physician has been negligent in diagnosing or treating a medical condition.  Estelle, 429 U.S. at 105-106.  Disagreement with medical treatment also does not state a constitutional claim for deliberate indifference to medical needs. Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997).

A prison inmate can demonstrate an Eight Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evidence a wanton disregard for any serious medical needs. Easter v. Powell, 467 F.3d 459, 464 (5th Cir. 2006) (citing Domino v. Tex. Dep't of Crim. J., 239 F.3d 752, 756 (5th Cir. 2001)).

A prison official is deliberately indifferent to serious medical needs of prisoners if he intentionally denies or delays access to medical care. Walker v. Butler, 967 F.2d 176, 178 (5th Cir. 1992); Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987). But a decision of whether to provide additional medical treatment is a classic example of a matter left for medical judgment. See Gobert, 463 F.3d at 347; Domino, 239 F.3d at 756. "Where a prisoner has received…medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law." Hamm v. Dekalb Cnty., 774 F.2d 1567, 1575 (11th Cir. 1985).

A prisoner's dissatisfaction with the care choices made by prison medical personnel does not, on its own, present a constitutional violation. Sama v. Hannigan, 669 F.3d 585, 590 (5th Cir. 2012) (citing Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006)). Negligence – even gross negligence – does not implicate the Constitution and does not provide a basis for a § 1983 claim. Farmer, 114 S.Ct. at 1978 ("[D]eliberate indifference entails something more than mere negligence").

Prisoners are not entitled to the "best medical care money can buy." Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

**D. Authement has not raised a genuine issue of material fact regarding deliberate indifference to his serious medical needs.**

**1. Authement's testimony.**

On or about October 2, 2014, Authement claims he began experiencing severe pain in his right side. (Doc. 1). On October 2, 2014, Authement filled out, signed, and turned in an RCC "Offender Medical Request Form," which stated:

> When I woke up I tried to use the restroom cause[sic] I had to pee bad. When I got there I could hardly pee and my side hurts so bad I can't lay down. (Doc. 101-1, p. 60).

Authement noted on that same form he had this problem for "1 day." (Doc. 101-1, pp. 11-13, 60/69). Authement testified that he saw Wilkinson on two occasions. (Doc. 101-1, p. 12/69). Authement turned in the sick form on October 2, 2014. (Doc. 101-1, p. 13/69). Authement testified that he first saw Wilkinson after Sergeant Simpson walked him to see her. (Doc. 101-1, p. 13/69).

Authement claims the pain was worse the next morning. (Doc. 1). Authement alleges he notified "Sgt. Simpson," who took Authement to see Wilkinson. (Doc. 101-1, p. 13/69). Authement claims Wilkinson was informed of the severe pain in the right side of his belly. (Doc. 1). Wilkinson obtained and tested Authement's urine sample. (Doc. 101-1, p. 14/69). Authement alleges Wilkinson found the test to be normal. (Doc. 1). Authement testified he was told there was nothing wrong with him and he was sent back to his dorm. (Doc. 101-1, p. 13-14/69). Authement alleges Sgt. Simpson returned Authement to the dorm and told

him if the pain got any worse to notify him. (Doc. 1). Authement claims fifteen to twenty minutes later, he told Simpson the pain was unbearable. (Doc. 1). Authement testified that Sgt. Simpson returned Authement to Wilkinson. (Doc. 101-1, p. 14/69).

Authement testified, and his medical records show, that because of his pre-existing medical condition known as Idiopathic Thrombocytopenic Purpura ("ITP") (hemophilia), he was prohibited from taking non-steroidal anti-inflammatories ("NSAIDs"), such as aspirin, Tylenol, or Ibuprofen. (Doc. 101-1, p. 14/69; Doc. 101-5, p. 23/58).

Authement alleges he was seen by Wilkinson, not a doctor. (Doc. 1). Authement testified Wilkinson told him he had a urinary tract infection, but he would have to "pass it on [his] own accord." (Doc. 101-1, p. 14/69). Authement claims Wilkinson, a nurse, is not a licensed physician and is not authorized to diagnose a urinary tract infection, or prescribe treatment. (Doc. 1). Authement claims Wilkinson was practicing medicine without a license, never notified the medical doctor, and denied Authement access to a medical doctor. (Doc. 1). Authement testified Wilkinson sent Authement back to his dorm with a "cold pack." (Doc. 101-1, pp. 14-15/69). Authement did not know what medicines were in the cold pack. (Doc. 101-1, p. 15/69).

Authement alleges Sgt. Simpson returned him to the dorm. (Doc. 1). When he returned to the dorm, he took the medications in the "cold pack." (Doc. 101-1, pp. 14-15/69). Authement claims he was unable to sleep, and approached the night

Sergeant who went to McNeely. (Docs.1, 53). Authement was unable to recall when he went to the hospital, but believes it was a day or two after seeing Wilkinson. (Doc. 101-1, p. 15/69). Authement testified he first saw the Lieutenant (McNeely), to whom he refers as "Catahoula," as soon as the shift changed to the night shift. (Doc. 101-1, p. 15-16/69). Authement also testified he saw the night shift Lieutenant on the same evening he saw Wilkinson. (Doc. 101-1, p. 16/69). He testified that he asked "Catahoula" to bring him to the hospital. (Doc. 101-1, p. 16/69).

Authement testified he was told he would be brought to the hospital in the morning, but did not arrive until that night. (Doc. 101-1, p. 16/69). Authement alleges McNeely was informed that Authement needed to go to the hospital, but that Wilkinson refused to send him. (Docs. 1, 53). Authement claims McNeely informed him that Wilkinson told McNeely he was not to send him to the hospital. (Docs. 1, 53). Authement claims nothing was done. (Docs. 1). Authement further alleges that the next day Wilkinson, in retaliation, delayed sending him and took four hours to complete the form to transfer him to the hospital. (Doc. 1).

Authement contacted his father through a friend. (Doc. 101-1, p. 16/69). Authement claims his father called administration and complained that Authement was being denied medical treatment and access to a medical doctor. (Doc. 1). Authement claims the Warden responded by ordering Wilkinson to send Authement to the hospital. (Doc. 1). He claims it was dark by the time he was placed in the transport van. (Doc. 1). Authement arrived at the hospital at night. (Doc. 101-1, p.

16/69). He does not recall if it was on the night of October 3, 2014. (Doc. 101-1, p. 16/69).

Upon arrival at RMC, Authement was examined by a doctor and ultimately underwent surgery for a ruptured appendix. (Doc. 101-1, pp. 16-17/69). Authement testified the surgeon told Authement that "it could have been 10 to 15 minutes" and he "could have died." (Doc. 101-1, p. 17/69). Authement was told his appendix ruptured while he was on the operating table. (Doc. 101-1, p. 17/69).

Authement's medical records show the following:

a) He arrived at Riverland Medical Center ("RMC") at 18:19 hours (6:19 p.m.) on October 3, 2014 with complaints of dull abdominal pain in the right lower quadrant. The severity was moderate. The duration of the pain was two days. There was exacerbation with local pressure. (Doc. 101-5, p. 10/58). He was diagnosed with acute appendicitis. (Doc. 101-5, p. 10/58).

b) On October 3, 2014, at 1832 hours (6:32 p.m.), Authement's chart noted "triage acuity: 4 – Non-Urgent." (Doc. 101-5, p. 21/58).

c) Authement's physical exam indicated that he was in "[n]o apparent distress; awake, alert, and oriented to person, place, and time; does not appear toxic; uncomfortable." (Doc. 101-5, p. 12/58).

d) Authement's physical exam indicated "tenderness in right lower quadrant of abdomen; bowel sounds are diminished; flat; no guarding noted; no abdominal mass palpable; no palpable organomegaly noted; no peritoneal signs noted; no rebound tenderness noted; soft; tenderness." (Doc. 101-5, p. 13/58).

e) Dr. James Ball ordered a CT scan of the abdomen and pelvis without contrast at 19:17 hours (7:17 p.m.) on October 3, 2014. (Doc. 101-5, p. 19/58).

f) On October 3, 2014, at 9:07 p.m., Dr. Phillip Crace dictated his report and stated: "I feel that he has likely early acute appendicitis and needs operative intervention." (Doc. 101-5, p. 9/58).

g) Authement was admitted to RMC on October 3, 2014 at 9:19 p.m. (Doc. 101-5, p. 3/58).

h) On October 3, 2014, at 22:24 hours (10:24 p.m.) Authement was taken to surgery. (Doc. 101-5, p. 21/58).

i) The CT was done without contrast and at laparotomy it was found Authement had feculent peritonitis with an obviously perforated appendix. (Doc. 101-5, p. 5/58).

j) RMC performed a laparoscopic appendectomy with placement of a Jackson-Pratt drain. (Doc. 101-5, p. 5/58).

k) The pre-operative diagnoses were:
    1) Right Lower Quadrant Abdominal Pain;
    2) Nausea;
    3) Leukocytosis with Left Shift;
    4) Pyrexia;
    5) Dehydration;
    6) Acute Appendicitis. (Doc. 101-5, p. 24 of 58).

l) The post-operative diagnoses were the same, but the sixth diagnosis was changed to "Acute Appendicitis (Perforated)." (Doc. 101-5, p. 24/58).

m) Authement was discharged from RMC on October 8, 2014 with diagnoses of:
    1) Perforated Appendicitis with Feculent Abdominal Contamination;
    2) Idiopathic Thrombocytopenic Purpura ("ITP");
    3) Thrombocytopenia;
    4) Right Lower Quadrant Abdominal Pain;
    5) Leukocytosis;
    6) Acute-on-Chronic Anemia. (Doc. 101-5, pp. 5-6/58).

n) After Authement's ITP responded well to steroids and he showed no further signs of bleeding, he was discharged back to the incarceration facility in stable condition. (Doc. 101-5, pp. 5-6/58).

Authement alleges he was released to RCC after two weeks in the hospital. (Doc. 1). When he returned to RCC, Authement was placed in a suicide watch cell for medical reasons. (Doc. 101-1, p. 18/69). He claims he stayed there for a week with no help. (Doc. 1).

Authement alleges he was released to the care of Wilkinson with several prescriptions. (Doc. 1). Authement alleges Wilkinson was responsible to procure and administer the prescribed medications, including antibiotics he was required to take post-surgery. (Doc. 1). However, Authement further alleges that when he returned to RCC, Wilkinson was on medical leave. (Doc. 1). Authement testified

that, upon his return from the hospital, he never saw Wilkinson again as he was told she was out having surgery. (Doc. 101-1, p. 18, 33/69).

Authement alleges Smalls was covering medical due to Wilkinson being out for surgery. (Doc. 1). Authement claims Smalls gave Authement his prescribed pain killer and stool softener, but never gave his prescribed antibiotics. (Doc. 1). Authement alleges his condition began to worsen, and he began having severe pain in his side. (Doc. 1). Authement alleges Smalls failed/refused to monitor his post-surgical condition and left him to suffer. (Doc. 1). Authement claims there was no nurse on duty, and no doctor was called. (Doc. 1). Authement claims Smalls withheld medical treatment that was ordered by the surgeon. (Doc. 1).

Authement received medicine – stool softener and pain medicine – while he was in the suicide watch cell. (Doc. 101-1, p. 18/69). Authement took the pain medicine as needed. (Doc. 101-1, p. 18/69). Authement testified that Smalls was giving Authement his medications – stool softener and pain medication. (Doc. 101-1, p. 21/69).

Authement was also was brought to Concordia Correctional Center ("CCC") to clean his wound and empty his drain. (Doc. 101-1, p. 18/69). He was treated by two nurses at CCC. (Doc. 101-1, p. 18/69). He believed it was two times a day. (Doc. 101-1, p. 18/69).

Authement told the nurses at CCC that something was not right – that he was experiencing more pain, which had started to recede, but came back. (Doc. 101-1, p. 19/69). Authement was not given any medication when he was at CCC. (Doc.

101-1, p. 19/69). At RCC, Authement received stool softener and pain medication, prescribed by the surgeon. (Doc. 101-1, p. 19/69). Authement testified he told Smalls about his abdomen pain every time he came with his medication. (Doc. 101-1, p. 35/69). Authement testified he asked Smalls to see a doctor, but he did not make a doctor available. (Doc. 101-1, p. 35/69). He also told the nurses at CCC, but never saw a doctor. (Doc. 101-1, p. 35-36/69).

Authement testified he reported his increased pain to "Catahoula" on the same day after he told the nurse at CCC (Doc. 101-1, p. 19-20/69). Authement recalled that "Catahoula" only worked nights. (Doc. 101-1, p. 20/69). Authement recalled that the nurse at CCC told him that if he needed to go to the hospital to tell whoever was in charge. When he returned, Catahoula gave him his pain medication. (Doc. 101-1, p. 20/69). Authement returned to his cell, but the pain increased. (Doc. 101-1, p. 20/69). Authement beat on the door and knocked on the glass. (Doc. 101-1, p. 20/69). A sergeant told him to wait. (Doc. 101-1, p. 20/69).

Authement testified that eventually, Catahoula came back. (Doc. 101-1, p. 20/69). Authement told Catahoula he needed to go to the hospital and that the nurse told him if he needed to go, they would take him. (Doc. 101-1, p. 20/69). Authement thought Catahoula called the nurse and the warden, who came and sent him to the hospital. (Doc. 101-1, p. 21/69). Authement testified he was brought to the hospital that same night. (Doc. 101-1, p. 21/69).

Authement was told he had infections from the appendix. (Doc. 101-1, p. 24/69). Authement had a second surgery performed by the same surgeon. (Doc.

101-1, p. 24/69). Authement had four inches of his intestine and his spleen removed. (Doc. 101-1, p. 27/69). Authement claims the physician called RCC and was informed by Smalls that he never received all of the prescribed medications. (Doc. 1). Authement testified he woke up the next morning and that was when the surgeon came in and called Smalls. (Doc. 101-1, p. 24/69). Authement testified he learned from the surgeon that he was not receiving one of his medications – antibiotics. (Doc. 101-1, p. 21/69).

Authement alleges he experienced a secondary systemic infection due to the failure/refusal of Defendants to provide him with antibiotics. (Doc. 1). Authement claims Smalls had no authority to override the doctor's orders, but did so anyway demonstrating malicious intent and callous indifference. (Doc. 1). Authement testified he knew it was Smalls because that was who was over the medication when Wilkinson was out. (Doc. 101-1, p. 21/69). Authement remembered papers were given to Smalls when he came back from his first surgery. (Doc. 101-1, p. 22/69). He specifically recalled seeing a paper prescription for stool softener, and he did receive that prescription. (Doc. 101-1, p. 23/69).

Authement's medical records show the following:

a) On October 12, 2014, at 00:14 hours (12:14 a.m.), Authement arrived to RMC. (Doc. 101-5, p. 57/58).
b) The Nursing Medical Record reflects a history of present illness and assessment performed on October 12, 2014, at 00:30 hours (12:30 a.m.) which notes: "[c]omplains of abdominal pain, post OP from 10/3/14 appendectomy, RLQ pain radiating to umbilicus, JP drain in place with red blood noted, reports pain since yesterday." (Doc. 101-5, p. 57-58).
c) The Physician Medical Record on October 12, 2014 reflects a history of present illness which notes: "[t]he location is diffuse bilaterally

throughout the body.  The quality is acute; chronic.  Status post appendectomy, rupture appendix 7 days ago, still has vac drain, with bright red blood in it.  The severity is moderate; severe. The duration is for a few days.  The timing is gradual.  Post operative." (Doc. 101-5, p. 48/58).

d) On October 12, 2014, at 00:35 hours (12:35 a.m.), a CT was ordered, which was interpreted as "Intra-abdominal hematoma/small bowel obstruction acuity: 2; thrombocytopenia acuity: 3; and anemia acuity: 4." (Doc. 101-5, p. 55/58).

e) On October 12, 2014, at 00:46 hours (12:46 a.m.), Authement's current medications indicated Percocet 10-325 mg Tablet Oral, prn. (Doc. 101-5, p. 57/58).

f) On October 12, 2014, at 00:49 hours (12:49 a.m.), Triage Nurse M.Carroll at RMC noted "[s]poke with Rivers Leuitenant[sic], pt. has not had prescribed Cipro as it was not received at the facility, Leuitenant[sic] McNeely reports that he contacted Nurse Cowan and was instructed to give a Bactrim since that was available tonight which pt. received between 1800-1900."  (Doc. 101-5, p. 57/58).

g) On October 12, 2014, at 2:41 a.m., Authement was admitted to the ICU at RMC. (Doc. 101-5, p. 35/58).

h) Authement was discharged on October 17, 2014 to EHCC in stable condition.  (Doc. 101-5, p. 41/58).

He was discharged, this time with two drains.  (Doc. 101-1, p. 25/69).  He received medical treatment from the nurses at CCC because Wilkinson was out. (Doc. 101-1, p. 25/69).  Authement was brought to RCC and placed in the suicide cell.  (Doc. 101-1, p. 25/69).  He could not recall how long he was there before he was sent to EHCC.  (Doc. 101-1, p. 25/69).  He was in a skilled nursing unit at EHCC. (Doc. 101-1, p. 25/69).  The nurses at EHCC brought him medication, checked his vitals, and cleaned his wound.  (Doc. 101-1, p. 25-26/69).  Authement was seen by a doctor at EHCC.  (Doc. 101-1, p. 26/69).  While at EHCC, Authement was given stool softener, pain medication, antibiotics, and a steroid.  (Doc. 101-1, p. 26/69). Authement had another surgery while in EHCC.  (Doc. 101-1, p. 26/69).

2. **Wilkinson's testimony.**

Wilkinson was an LPN at RCC from approximately 2012 to 2016. (Doc. 101-4, pp. 3-4/22). Wilkinson testified that according to Authement's medical records, he initially came in complaining of side pain and difficulty urinating. (Doc. 101-4, p. 4/22). Wilkinson only remembers it was side pain, not abdomen. (Doc. 101-4, p. 11). She testified a UA was performed, and Authement had positive white blood cells, leukocytes, and trace blood in his urine. (Doc. 101-4, p. 4/22). Per standing orders, Wilkinson placed Authement on Zantac 150 milligrams for gastritis for pain complaints that weren't constant, and Metacycline 100 milligrams for leukocytes. (Doc. 101-4, p. 5/22). Wilkinson testified the Metacycline 100 milligrams was to rule out UTI. (Doc. 101-4, p. 5/22). Wilkinson testified the standing orders were for RCC and CCC. (Doc. 101-4, p. 5/22). She thought the names of both facilities would be on the standing orders. (Doc. 101-4, p. 5/22). Wilkinson was out on leave when Authement had his appendix taken out. (Doc. 101-4, p. 5/22). She did not remember anything else about Authement. (Doc. 101-4, p. 5/22).

Wilkinson testified that both RCC and CCC were overseen by the same doctors. (Doc. 101-4, p. 6/22). She also testified that both facilities are operated by the Concordia Parish Sheriff's Office. (Doc. 101-4, p. 6/22). Wilkinson testified that RCC and CCC shared the same supplies if they needed to, but the ordering was done separately. (Doc. 101-4, p. 6/22). Wilkinson testified that RCC also shared staff with CCC. (Doc. 101-4, p. 6/22). Wilkinson testified that if someone was out sick, and needed help, needed sick call, or medical advice, CCC would assist. (Doc.

101-4, p. 6/22). Wilkinson testified there are no RNs or physicians that worked at RCC in October 2014. (Doc. 101-4, p. 6/22). Wilkinson could call a physician or could refer out to a physician. (Doc. 101-4, p. 6/22). If she wanted to send an inmate to an urologist, Wilkinson testified she would have to go through the facility doctor for a referral to a specialist. (Doc. 101-4, p. 6/22). She testified that the doctor came once a week. (Doc. 101-4, p. 6/22). She did not recall him coming on other days, but he would send someone to the emergency room if needed. (Doc. 101-4, p. 7/22). Wilkinson did not know why Authement never saw a doctor while at RCC. (Doc. 101-4, p. 7/22).

Wilkinson testified that if an inmate had a sick call, and it was not an emergency, an inmate wanted to or needed to see a doctor, or for over her scope of practice, she would refer them to the doctor for when he came on Thursday. (Doc. 101-4, p. 7/22). She testified that if something was left untreated she could not with standing orders treat herself, the inmate saw the doctor on Thursday. (Doc. 101-4, p. 7/22). If an inmate asked to see a doctor, Wilkinson testified that he would, if it wasn't addressed in his standing orders. (Doc. 101-4, p. 7/22). She testified that an inmate would go to RMC if it was an emergency. (Doc. 101-4, p. 7/22).

Wilkinson testified that she controlled whether an inmate saw a doctor. (Doc. 101-4, p. 8/22). She testified that the doctors documented when they came every Thursday, and performed chart reviews once a month. (Doc. 101-4, p. 8/22). She testified the doctor also performed a medication review once a month. (Doc. 101-4, p. 8/22).

18

Wilkinson went out on leave October 3, 2014. (Doc. 101-4, p. 9/22). She was out for about two weeks.[3] (Doc. 101-4, p. 9-10/22). Wilkinson never discussed Authement's medical condition with a doctor. (Doc. 101-4, p. 10/22). Wilkinson does not believe Authement was at RCC when she returned from leave. (Doc. 101-4, p. 9-10/22). Wilkinson recalled a Correctional Officer Simpson, but does not remember him telling her Authement's condition could be an appendix. (Doc. 101-4, p. 11/22). Wilkinson was aware Authement had ITP, and that it affected her treatment of him with pain medication. (Doc. 101-4, p. 11/22). She testified that NSAIDs would increase bleeding with ITP. (Doc. 101-4, p. 11/22). She did not recall giving Authement a cold pack. (Doc. 101-4, p. 11/22). She did not recall ever speaking to Authement's family on the phone. (Doc. 101-4, p. 12/22). Wilkinson testified there was no medical staff at RCC at night in October 2014. (Doc. 101-4, p. 12/22). When she was not out on sick leave, she was the nurse on call at night. (Doc. 101-4, p. 12/22). She does not know why Authement did not get his antibiotics after he was released from surgery. (Doc. 101-4, p. 13/22).

Wilkinson testified that the policy for an inmate post-surgery would be to go into medical observation until they saw the doctor on Thursday. (Doc. 101-4, p. 13-14/22). Wilkinson's review of records shows reports from Deborah Cowan, Kathy Forman, and Stacy Buckley. (Doc. 101-4, p. 14/22). Wilkinson was not aware of anyone that was covering for her at RCC while she was out. (Doc. 101-4, p. 14/22).

---

[3] Wilkinson's attendance records show she worked the following workdays: Wednesday, October 1; Thursday, October 2; Friday, October 3; and Monday, October 6. (Doc. 109-3, pp. 1-2). She was approved and out on sick leave on the following days: Tuesday, October 7, through Friday, October 10. (Doc. 109-3, pp. 1-2). She did not show any time for Saturday, October 4, or Sunday, October 5. (Doc. 109-3, pp. 1-2).

Regarding the prescription for Cipro, she testified that whoever was on call at that time would be in charge of getting it. (Doc. 101-4, p. 14-15/22). Wilkinson testified that the allegations – that she told McNeely to not send Authement to the hospital if he asked – did not occur. (Doc. 101-4, p. 15/22).

### 3. Smalls's testimony.

Smalls has been employed at RCC for six years as a correctional officer. (Doc. 101-2, p. 3/18). Smalls was working at RCC in October 2014.[4] (Doc. 101-2, p. 4/18).

Smalls was not familiar with Authement, and did not remember anything about Authement. (Doc. 101-2, p. 4/18). Smalls did not recall an inmate who had a ruptured appendix. (Doc. 101-2, p. 5/18). Smalls did not recall an inmate who did not get his medications and got a bad infection. (Doc. 101-2, p. 5/18). Smalls testified only one nurse is employed at RCC, and there is no medical at night or on weekends at RCC. (Doc. 101-2, p. 5/18). He testified that on Thursdays, a doctor comes to RCC. (Doc. 101-2, p. 5/18). Smalls testified that Dr. Moak and Dr. Gremillion rotate. (Doc. 101-2, p. 5, 8/18). Smalls did not know anything about any standing orders. (Doc. 101-2, p. 5/18).

Smalls recalled that inmates receive prescribed medications through pill call. (Doc. 101-2, p. 5/18). Smalls testified he has never done pill call or passed pills. (Doc. 101-2, p. 5/18). Smalls never handed out medications. (Doc. 101-2, p. 5/18). Smalls was not familiar with a condition called ITP or hemophilia. (Doc. 101-2, p.

---

[4] Smalls's attendance records show he worked the following workdays: Friday, October 3 through Sunday, October 5; Wednesday, October 8, through Thursday, October 9; Monday, October 13, through Tuesday, October 14; Saturday, October 18, through Sunday, October 19; and Wednesday, October 22, through Thursday, October 23. (Doc. 109-7, pp. 1-4).

7/18). Smalls had no idea if at any point in time Wilkinson was out for any surgery. (Doc. 101-2, p. 7/18). Smalls testified he cannot complete a medical request for an inmate. (Doc. 101-2, p. 7/18). If an inmate is too sick to write, he would have to send them to medical. (Doc. 101-2, p. 7/18).

Smalls did not know what the relationship was between the medical department at CCC and the medical department at RCC. (Doc. 101-2, p. 7/18). Smalls did not recall any phone conversations with Authement's family. (Doc. 101-2, p. 7-8/18).

Smalls testified he has never been in charge of an inmate's care, and has never been in charge of handing out pills at pill call. (Doc. 101-2, p. 10,12/18). He was not instructed by Wilkinson to do anything with an inmate. (Doc. 101-2, p. 10/18). Smalls testified he was never asked to monitor the condition of an inmate from a medical perspective. (Doc. 101-2, p. 11/18). Smalls testified he has never overridden any doctor's order concerning medical care for an inmate. (Doc. 101-2, p. 10/18). He has never talked to a doctor about an inmate's care. (Doc. 101-2, p. 11/18).

Smalls testified that he does not know whether Authement was ever prescribed any medications while at RCC. (Doc. 101-2, p. 11/18). Smalls did not receive Authement's medical information when he returned from any hospital. (Doc. 101-2, p. 11/18). Smalls was never instructed to perform medical care or medical monitoring while Wilkinson was working at RCC, or because she was not there. (Doc. 101-2, p. 11/18).

### 4. McNeely's testimony.

McNeely recalled Authement had an appendix that ruptured, and had some medical complications. (Doc. 101-3, p. 3/45). McNeely recalled that he would have been told at shift change that Authement had a medical condition. (Doc. 101-3, p. 4/45). Authement would have been in medical observation, which is also referred to as a suicide cell. (Doc. 101-3, p. 4/45).

After shift change, McNeely would give Authement any medications that would have been in the narcotic box, which he had to dispense as shift lieutenant. (Doc. 101-3, p. 4/45). McNeely would make sure the pill call officer dispenses the medication in a timely fashion. (Doc. 101-3, p. 4/45). McNeely himself dispensed only narcotics. (Doc. 101-3, p. 4/45). McNeely would not dispense antibiotics. (Doc. 101-3, p. 5/45).

McNeely recalled that he saw Authement in a medical observation suicide cell in A hall. (Doc. 101-3, p. 5/45). To receive narcotics, Authement would have been escorted by an officer to the infirmary where the medication is administered. (Doc. 101-3, p. 5/45). A count would be done on the pills, and both would sign or initial the count sheet that he received his medication. (Doc. 101-3, p. 5/45). McNeely recalled Authement going to medical and signing a count sheet. (Doc. 101-3, p. 6/45).

The paperwork from the hospital is handed to the medical supervisor, attending nurse, or the shift lieutenant. (Doc. 101-3, p. 6/45). The shift lieutenant would pass it to the nurse or medical supervisor. (Doc. 101-3, p. 6/45). He was the

shift lieutenant. (Doc. 101-3, p. 6/45). He would give the prescriptions to the nurse. (Doc. 101-3, p. 6/45). If no nurse was there, he would have called the on-call officer, either Captain Stuckey or Major Poole. (Doc. 101-3, p. 6/45). McNeely did not know how prescriptions were not filled. (Doc. 101-3, p. 6/45). The prescriptions would be placed in the nurse's office in medical. (Doc. 101-3, p. 6/45).

McNeely recalled that Wilkinson was out for a gallbladder surgery. (Doc. 101-3, p. 6/45). He recalled that this was during the time frame that Authement was in the suicide cell in A hall. (Doc. 101-3, p. 7/45). He recalled that Authement complained of pain and Wilkinson was not there. (Doc. 101-3, p. 7/45). McNeely referred Authement to the nurse next door, at CCC – either Nurse Cowan or the other nurse. (Doc. 101-3, p. 7/45). McNeely monitored Authement. (Doc. 101-3, p. 7/45).

He told the nurses at CCC that Authement was having complications and pain. (Doc. 101-3, p. 7/45). McNeely was told to give Authement his medication, observe him, and call back to send him to the emergency room if his condition did not improve. (Doc. 101-3, p. 7/45). McNeely did not call the doctor because he does not have a number to a doctor, and RCC does not have a doctor. (Doc. 101-3, p. 7/45). There is no doctor on call at RCC for a shift supervisor to call. (Doc. 101-3, p. 7/45). If McNeely thought it was an emergency, he would send him to the emergency room. (Doc. 101-3, p. 7/45).

McNeely gave Authement antibiotics on a sole occasion when Authement did not have any antibiotics and the nurse next door authorized him to give Authement

Bactrim because RCC did not have anything there. (Doc. 101-3, p. 8/45). He did not know why Authement's antibiotic prescription was not filled. (Doc. 101-3, p. 8/45). When McNeely called the nurse next door, either Cowan or Buckley, at CCC, he told her the information he had, and she knew that Authement was supposed to be receiving an antibiotic, but was not getting it. (Doc. 101-3, p. 8/45). McNeely did not recall how many times a day he was told to give Bactrim. (Doc. 101-3, p. 8/45). He could obtain Bactrim on hand from the infirmary stock. (Doc. 101-3, p. 8/45). McNeely testified he thinks he gave the first administration of Bactrim to Authement, but it could have been the pill call officer. (Doc. 101-3, p. 8-9/45).

McNeely testified that after he administered the Bactrim, Authement started feeling some tenderness and soreness in his side. (Doc. 101-3, p. /45). McNeely called the nurses at CCC back and it was deemed necessary to send him to the emergency room. (Doc. 101-3, p. 9/45). McNeely sent Authement to the emergency room, but did not go with him. (Doc. 101-3, p. 9/45). McNeely testified he later learned Authement had an infection from his initial surgery from his appendectomy. (Doc. 101-3, p. 9/45). McNeely testified somebody from the hospital called him, informed him Authement had an infection and that they were going to admit him. (Doc. 101-3, p. 9/45). McNeely did not recall someone saying they did not give him the antibiotics the hospital prescribed. (Doc. 101-3, p. 9/45). McNeely learned that evening that Authement had not been given his antibiotic prescription. (Doc. 101-3, p. 10/45). McNeely was not sure if Authement had a Medical

Administration Record ("MAR") sheet, or a sheet showing the prescription and times administered. (Doc. 101-3, p. 10/45).

McNeely testified he was referred to talk to the nurses next door. (Doc. 101-3, p. 12/45). McNeely believed Authement told the nurses he was not getting his antibiotics from the first surgery. (Doc. 101-3, p. 12/45). McNeely testified this was when he consulted the nurses next door. (Doc. 101-3, p. 12/45). McNeely testified he looked through Authement's medical records to find his post-surgery prescriptions, but did not find a prescription for antibiotics. (Doc. 101-3, p. 12/45). McNeely wrote a report, a UOR, regarding what happened. (Doc. 101-3, p. 13/45). McNeely testified that was the end of protocol since Authement was then in the hospital's care at that time. (Doc. 101-3, p. 13/45).

Per the UOR, McNeely testified that he called the nurses at 7:20 p.m. on October 11, 2014. (Doc. 101-3, p. 18/45). That was when Mr. Authement presented himself to him. (Doc. 101-3, p. 18/45). McNeely spoke with Stacy Buckley at 7:20 p.m. at CCC, and she informed him to notify Deborah Cowan, which he did. (Doc. 101-3, p. 19/45). McNeely was told by Cowan to start Authement on Bactrim because they did not have any Cipro to give him. (Doc. 101-3, p. 19/45). McNeely followed the nurse's instructions each time of the two times he called. (Doc. 101-3, p. 19/45).

McNeely also wrote a UOR after Authement's initial surgery when Authement had to go next door for dressing changes since RCC does not have proper nursing staffing for that kind of care. (Doc. 101-3, p. 14/45).

25

McNeely is familiar with RCC's standing orders, but he did not have any responsibility for implementing the orders. (Doc. 101-3, p. 16/45). Wilkinson was charged with supervising medical care at RCC in October 2014, and that no one did so while she was out. (Doc. 101-3, p. 16/45). McNeely had no knowledge of any grievances filed by Authement. (Doc. 101-3, p. 16/45).

McNeely testified that the allegation – that he told Authement that Wilkinson told McNeely not to send Authement to the hospital if he asked to go – never occurred. (Doc. 101-3, p. 19/45). McNeely worked the evening, beginning at five p.m., October 2, 2014 through five a.m. October 3, 2014. (Doc. 101-3, p. 20-21/45). On a normal work day, he would not see Wilkinson. (Doc. 101-3, p. 20-21/45). After leaving on October 3, McNeely came back on at five p.m. on October 6, 2014. (Doc. 101-3, p. 21/45). McNeely would not have been at RCC to tell Authement anything on October 3, 2014. (Doc. 101-3, p. 21/45). McNeely would have no knowledge of any care or treatment on October 3, 2014 after five a.m. (Doc. 101-3, p. 22/45).[5]

McNeely testified that while the nurse was out, he would have been given a verbal standing order to call next door if he needed any help. (Doc. 101-3, p. 24/45). McNeely did not know the hours of the nurses's shifts next door, but recalled that the nurse he spoke to October 11, 2014 answered. (Doc. 101-3, p. 24/45). He called on her cell phone. (Doc. 101-3, p. 24/45). McNeely testified that neither one of the

---

[5] McNeely's attendance record shows he worked the following workdays: Wednesday, October 1; Thursday, October 2; Monday, October 6; Tuesday, October 7; Friday, October 10; Saturday, October 11; Sunday, October 12; Wednesday, October 15; Thursday, October 16; Monday, October 20; Tuesday, October 21. (Doc. 101-3, p. 45/45).

nurses from CCC came to perform an exam on Authement, but he did an exam. (Doc. 101-3, p. 25/45). McNeely drained the drain bulb and documented 28 milliliters of red fluid. (Doc. 101-3, p. 25-26/45). McNeely testified he took and acted on a medical order from Cowan at CCC over the phone. (Doc. 101-3, p. 26/45). McNeely testified that if there were any medications on a pill cart or not on a pill cart during the day, he would have no knowledge of that. (Doc. 101-3, p. 22/45).

McNeely never spoke to Wilkinson about Authement. (Doc. 101-3, p. 26/45). McNeely testified that he reflected giving Authement Bactrim in his UOR Report, which the nurse should have also had in her records. (Doc. 101-3, p. 27/45). Regarding the MAR, McNeely did not know who the initials "ZE" belong to, and testified that "R" stands for refused. (Doc. 101-3, p. 28/45, Doc. 109-1, p. 14/18). However, he testified he did not write anything on the MAR. (Doc. 101-3, p. 28/45).

     5.    **There is no evidence that Defendants were deliberately indifferent to Authement's serious medical needs.**

Authement claims lack of care contributed to the severity of his appendicitis. Authement claims Defendants failed to provide adequate medical treatment directly followed by a lack of postsurgical treatment, including a failure to administer antibiotics and assist with recovery. (Doc. 1). However, the Court finds that Authement was treated by Wilkinson, per standing orders on the same date of his complaints with Zantac 150 milligrams for gastritis, and Metacycline 100 milligrams for leukocytes. (Doc. 101-4, p. 5/22). Additionally, the Court finds Authement could not be treated for pain with NSAIDs due to his ITP. (Doc. 101-1,

p. 14/69; Doc. 101-5, p. 23/58; Doc. 101-4, p. 11/22). There is no evidence to show Wilkinson was deliberately indifferent to Authement's serious medical needs.

Wilkinson went on leave after working the day shift on October 3, 2014. (Doc. 109-3, pp. 1-2). Authement was brought to the hospital on October 3, 2014, arriving at 6:19 p.m. with a diagnosis of acute appendicitis, and triage of 4, non-acuity. (Doc. 101-5, p. 10, 21/58). Almost 3 hours later, Dr. Crace noted he thought Authement had early acute appendicitis and needed surgery. (Doc. 101-5, p. 9/58). At 10:24 p.m., over four hours after arriving at RMC, Authement was taken to surgery. (Doc. 101-5, p. 21/58). During surgery, it was discovered Authement had a perforated appendix. (Doc. 101-5, pp. 5-6/58). Authement was discharged on October 8, 2014 to RCC. (Doc. 101-5, pp. 5-6/58).

When Authement arrived at RCC, post-surgery, on October 8, 2014, Wilkinson was out on leave. (Doc. 109-3, pp. 1-2). Authement alleges Smalls was covering medical due to Wilkinson being out for surgery. (Doc. 1). Authement claims Smalls gave Authement his prescribed pain killer and stool softener, but never gave his prescribed antibiotics. (Doc. 1). Authement alleges Smalls failed or refused to monitor his post-surgical condition and left him to suffer. (Doc. 1). However, there is no evidence that Smalls or Wilkinson took any part in Authement's care post-surgery.

Rather, the evidence shows McNeely was the only named Defendant involved in Authement's post-surgical care and treatment. McNeely was not on shift when Authement arrived to RCC. (Doc. 101-3, p. 45/45). Authement was treated by two

nurses at CCC two times daily for wound care, to assess vitals, and to empty his drain. (Doc. 101-1, p. 18/69).

McNeely returned to work on October 10, 2014, and was working on October 11, 2014. (Doc. 101-3, p. 45/45). Authement reported his pain to the nurses at CCC, and to McNeely that same night. (Doc. 101-1, p. 19-20/69). The evidence shows that on October 11, 2014, at 7:20 p.m., McNeely told the nurses at CCC that Authement was having complications and pain. (Doc. 101-3, p. 7, 18/45). McNeely was told by the nurses at CCC to give Authement his medication, observe him, and call back to send him to the emergency room if his condition did not improve. (Doc. 101-3, p. 7/45). McNeely testified he gave Authement Bactrim, following the instructions given him by the nurse at CCC, because RCC did not have Cipro on hand. (Doc. 101-3, p. 8, 19/45).

The evidence shows McNeely had no knowledge regarding where to fill prescriptions or who would be responsible for filling prescriptions for inmates, but that he called the nurses at CCC when Authement made a complaint. (Doc. 101-3, p. 8/45; Doc. 101-5, p. 57/58). McNeely continued to monitor Authement's condition, and notified the nurses at 11:25 p.m. that he needed to go to the hospital. (Doc. 109-1, p. 15/18). The evidence shows that Authement was brought to the hospital the same night of his complaints to both the nurses at CCC and to McNeely. (Doc. 101-1, p. 21/69; Doc. 101-3, p. 18-19/45). Authement arrived to RMC on October 12, 2014, at 12:14 a.m. (Doc. 101-5, p. 57/58). Authement's medical record showed a

notation that he had not had the prescribed Cipro as it was not received at the facility, (Doc. 101-5, p. 57/58).

To defeat Defendants' summary judgment, Authement must produce evidence that presents a genuine issue of material fact that the defendants' conduct amounts to a violation of Authement's constitutional rights. Estate of Pollard, 579 F.App'x at 264. Here, no prison official refused to treat Authement, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evidence a wanton disregard for any serious medical needs. Easter v. Powell, 467 F.3d 459, 464 (5th Cir. 2006) (citing Domino v. Tex. Dep't of Crim. J., 239 F.3d 752, 756 (5th Cir. 2001)).

Authement has offered no evidence that Defendants refused his care, or ignored his complaints. Rather, the evidence shows that Defendants provided medical treatment each time Authement presented complaints. There is no evidence Authement presented complaints other than pain related complaints at RCC. There is no evidence he had other symptoms of appendicitis other than side pain prior to his arrival at RMC.

Access to emergency medical care falls within the "minimal civilized measure of life's necessities." See Wilson v. Seiter, 501 U.S. 294, 298 (1991). When a gatekeeper to emergency care knowingly disregards a prisoner's complaints, he acts with deliberate indifference to that prison's medical needs. See Rodrigue v. Morehouse Det. Ctr., 2012 WL 4483438, at *6 (W.D. La. 2012), aff'd, 557 Fed.Appx.

341 (5th Cir. 2014) (prison officials were not entitled to qualified immunity where they ignored prisoner's requests for medical care for his obviously dire condition).

In Rodrigue, the prisoner's only medical care provider was a licensed practical nurse who treated his repeated vomiting, that was caused by a ruptured appendix, with nausea medication and an enema. By the time Rodrigue was sent to the hospital, 10 days after the onset of his symptoms, sepsis had set in and he required three surgeries and an extended recovery period. The district court and the Fifth Circuit found defendant had been deliberately indifferent to Rodrigue's obviously serious need to medical care and were not entitled to qualified immunity.

This case is plainly different from Rodrigue. Authement has presented no evidence as to any conscious disregard or sufficiently culpable state of mind as to any named Defendant. See Farmer, 511 U.S. at 834. To the contrary, the evidence shows a trier of fact would find only a lapse in antibiotic treatment, which at most could be negligence or even gross negligence. See Gobert, 463 F.3d at 352. "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." Thompson v. Upshur County, Texas, 245 F.3d 447, 459 (5th Cir. 2001). There is no evidence that Defendants were deliberately indifferent to Authement's serious medical condition.

E.    **State Law Claim**

Authement also raised a state negligence claim for failure to provide antibiotics under La. Civ. Code Art. 2315. When, as recommended here, all claims which conferred federal subject matter jurisdiction are dismissed, the court may decline to exercise supplemental jurisdiction over the remaining state law claims.

31

28 U.S.C. § 1367(c); see Priester v. Lowndes County, 354 F.3d 414, 425 (5th Cir. 2004) (citation omitted). As a general rule, state claims should be dismissed when the federal claims to which they are pendent are dismissed. Parker & Parsley Petroleum Co. v. Dresser Industries, 972 F.2d 580, 585 (5th Cir. 1992). The Louisiana state court may analyze this claim under a duty-risk analysis. Under the circumstances of this case, that analysis is better left to the state court. Accordingly, Authement's negligence claim should be dismissed without prejudice.

III. Conclusion

Based on the foregoing, IT IS RECOMMENDED that Defendants' Motion for Summary Judgment (Doc. 98) be GRANTED as to Authement's § 1983 claims and Authement's negligence claim.

IT IS FURTHER RECOMMENDED that Authement's § 1983 claims against Defendants be DISMISSED WITH PREJUDICE, and that Authement's negligence claim be DISMISSED WITHOUT PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor

encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this ___28th___ day of December, 2017.

Joseph H.L. Perez-Montes
United States Magistrate Judge